IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

**176 RAGLAND EAT, LLC, and**
**U-HAUL CO. OF WEST VIRGINIA**

     **Plaintiffs,**

v.

                                               Civil Action No.: 5:23-cv-00339

**DDP ROOFING SERVICES, INC.,**

     **Defendant.**

## FIRST AMENDED COMPLAINT

For and as their Complaint against the above-named Defendant, 176 Ragland EAT, LLC ("176 Ragland") and U-Haul Co. of West Virginia ("UHWV," but unless otherwise specified, referred to collectively with 176 Ragland as "Plaintiffs") state as follows:

## INTRODUCTION

Plaintiffs bring this action to recover damages for the complete and total loss of property that was burned to the ground as a direct result of the conduct of a roofing company hired by Plaintiffs: DDP Roofing Services, Inc. ("DDP" or "Defendant"). As set forth in greater detail herein, on the afternoon of November 17, 2021, a devastating fire (the "Fire") completely destroyed Plaintiffs' storage facility located at 176 Ragland Road, Beckley, WV, (the "Building"). The fire started because of the negligent and reckless conduct of DDP.

During DDP's work, DDP cut flammable roofing material on the roof (such as dry wood and insulation) using power tools that carry an increased risk of starting a fire, and it also ran several gas-powered generators on top of the roof around those same flammable roofing materials.

1

The Fire started precisely where DDP's workers were cutting flammable materials with dangerous power tools—on the roof area. Indeed, the firefighters who initially responded to the scene documented that the roof was on fire first and, from there, the Fire "quickly spread to the warehouse storage area below." Plaintiffs' video surveillance footage makes this point clear as well. It captures several DDP workers rushing into the warehouse storage area, frantically looking and pointing up and using a ladder to climb on top of storage units with fire extinguishers to reach spraying distance of the fire.

DDP failed to extinguish the Fire that it started. And, thereafter, one of DDP's workers was caught attempting to remove accessories to one of DDP's power tools (grinder wheels) from the scene. When the DDP worker was caught and told not to remove evidence from the Building, the DDP worker took off his jacket (with a DDP logo on it) and draped it over the grinder wheels, in an apparent attempt to conceal them from being found. Highlighting the fault and reprehensible conduct of DDP, the workers that caused the Fire avoided investigators by leaving the scene or otherwise refusing to come forward to provide statements or other information.

DDP caused the Fire by breaching multiple obligations. To name a few, such breaches include failing to take reasonable safety precautions to protect the worksite and Building; using fire-prone power tools to cut flammable roofing materials; storing gasoline-powered generators on top of the roof around flammable materials; failing to take basic steps to prevent a fire; and failing to be prepared to put a fire out (that was caused by the acts and omissions of its workers).

As a direct and proximate result of DDP's breaches, Plaintiffs have incurred—and continue to incur—substantial damages, which include, but are not limited to, the cost of replacing the Building to current code and the loss of years of rental income. Plaintiffs bring this case to recover all available damages arising from the Fire caused by DDP.

## THE PARTIES

1. 176 Ragland is a Nevada limited liability company that is affiliated with UHWV and is the owner of the Building.

2. UHWV is a West Virginia corporation that leases the Building from 176 Ragland. As such, UHWV generates income from the Building and is the corporate entity that contracted with DDP to perform roofing services.

3. DDP is in the business of performing industrial and commercial roofing services. DDP contracted with UHWV to perform roofing services on the Building.

## JURISDICTION AND VENUE

4. For all times relevant to the Complaint, 176 Ragland was (and still is) a Nevada limited liability company with its principal place of business in Nevada. AREC 1031 Holdings, LLC, a Nevada limited liability company ("AREC 1031"), was (and still is) the sole member of 176 Ragland. Amerco Real Estate Company, a Nevada corporation ("AREC"), was (and still is) the sole member of AREC 1031. For all times relevant to the Complaint, AREC had its principal place of business in Arizona.

5. For all times relevant to the Complaint, UHWV was (and still is) a West Virginia corporation with its principal place of business in West Virginia.

6. For all times relevant to the Complaint, DDP was (and still is), a Pennsylvania corporation with its principal place of business in Pennsylvania.

7. The amount in controversy, exclusive of interest and costs, exceeds $75,000.00. Moreover, there is complete diversity of citizenship between 176 Ragland, UHWV, and DDP (collectively, the "Parties"). The Court thus has subject-matter jurisdiction over the claims asserted herein under 28 U.S.C. § 1332.

8. In addition, DDP sought and received a license by the West Virginia Department of Labor's Contractor Licensing Board to perform work in West Virginia. Accordingly, DDP has purposefully availed itself of the privilege of conducting business activities within West Virginia, thus invoking the benefits and protections of West Virginia law.

9. Moreover, Section 11.1 of the Contract states that: "The Contract Documents shall be governed by the law of the place where the project is located[,]" which is West Virginia. Indeed, apart from Section 11.1, the Contract refers to West Virginia state law at least eight times. *Id*. at §§ 8.5, 8.6, 12.2, 12.4, 13.2, 14.1, 14.2, 16.2. By entering into and signing the Contract, DDP further invoked the benefits and protections of West Virginia law with regard to the specific Contract and roofing project at issue in this Complaint.

10. The acts and omissions underlying the Complaint occurred in West Virginia.

11. The Court may properly exercise personal jurisdiction over DDP.

12. Moreover, the acts and omissions underlying the Complaint occurred in the Southern District of West Virginia. Accordingly, this district is a proper venue for litigating this case.

## FACTS

*A.* *The Contract*

13. DDP and UHWV entered into the Contract for DDP to perform roofing work on the Building.

14. Under Section 3.1 of the Contract, DDP agreed to achieve substantial completion of the roofing work on or before November 30, 2021. Substantial completion is defined as "the time at which the project is ready to be occupied by U-Haul [UHWV] and when the only work

remaining to be done is minor correcting and touching-up and/or installation of minor items not vital to the usefulness of the project."

15. Under Section 8.7 of the Contract, DDP agreed to "be responsible to U-Haul [UHWV] for the acts and omissions of his employees, subcontractors and their agents and employees, and other persons performing any of the work under a contract with the contractor."

16. Under Section 13.1 of the Contract, DDP agreed to "take all reasonable safety precautions, specifically to protect and safeguard" the following: "All employees on the work and other persons who may be affected;" "The entire project and all the materials and equipment to be incorporated therein;" and "Any and all other property at the site or adjacent thereto."

17. Under Section 11.2 of the Contract, DDP agreed to the following provision relating to attorneys' fees: "If U-Haul [UHWV] and [DDP] do not mutually declare in writing the claim or dispute is minor, the matter shall then be settled in a court of law. In either case the prevailing party shall be awarded its costs (including reasonable attorney's fees), incurred." (Brackets added).

### B. *DDP's Work on the Roof Before the Fire*

18. DDP's roofing work under the Contract involved at least the following two tasks: (a) demolishing/removing the old roof; and (b) installing a new roof.

19. DDP performed these two tasks (demolishing/removing the old roof and installing the new roof) on a section-by-section basis, as opposed to removing the entirety of the old roof first and then installing the entirety of the new roof.

20. The building's old roof contained materials that are known to be flammable, such as dry wood and insulation. These materials were cut from the roof for later removal from the Building.

21. Similarly, the new roof that was being installed on the Building contained flammable materials, such as wood decking, 2 layers of roof insulation (totaling 3.5 inches deep), and thermoplastic polyolefin.

22. Because DDP's work was performed on a section-by-section basis, flammable materials from both the old roof and the new roof could be on the roof at the same time during DDP's work.

23. To perform its work, DDP used power tools to cut flammable materials while on the roof, both for purposes of removing the old roof and for installing the new roof.

24. In addition to the flammable materials being cut, other flammable roofing materials not being cut were in the vicinity of DDP's running power tools.

25. At least some of the tools used by DDP to cut roofing materials contain a rotating blade, including the following:

   a. At least two walk-behind grinders used or procured by DDP were recovered from the Building;

   b. A picture taken by DDP shows a hand-held grinder on top of the roof;

   c. Grinder wheels were found at the Building. After the fire, a DDP worker was found attempting to remove the grinder wheels. When the DDP worker was told not to remove the grinder wheels, the DDP worker took off his jacket and placed them over the grinder wheels, so as to conceal them;

   d. A chop saw was recovered from on top of the roof debris after the fire;

   e. Circular blades were recovered from on top of the roof debris after the fire;

  f. At least one eye-witness has stated that he saw multiple DDP workers using a K-12 saw- a specialty large two hand handheld, rotating blade saw that can cut metal, masonry/asphalt, wood, and roofing material.

26. In connection with its use of power tools to cut flammable materials, DDP ran at least two gas-powered generators on top of the roof.

27. The power tools DDP used with a rotating blade are capable of, and indeed, are known to throw sparks, fragments of the material being cut, and even pieces of a broken blade a considerable distance—and in turn, the power tools that DDP used carry a heightened risk of starting a fire.

28. Upon information and belief, DDP caused the Fire by using power tools to cut roofing materials in and around the roof, other roofing materials, and flammable materials.

29. Notwithstanding DDP's use of power tools known to carry an increased risk of starting a fire to cut flammable materials on the roof, and even though DDP had multiple gas-powered generators on the roof, DDP did not have an adequate number of fire extinguishers (if any fire extinguishers) ready on the roof to extinguish a fire quickly or prevent a fire from spreading.

30. Upon information and belief, DDP failed to develop a fire prevention or safety plan for the project, nor did it coordinate with the local fire department or fire marshal to ensure work being performed complied with applicable fire prevention requirements.

***The Fire***

31. On Wednesday, November 17, 2021, at around 2:50 pm, the fire started.

32. The fire began in the roof area.

33. Approximately a dozen DDP workers were performing work on the roof at the time that the fire began in the roof area.

34. Upon information and belief, the fire started because DDP workers were on the roof sawing through materials and creating sparks, which ignited flammable materials.

35. When firefighters responded to the Building fire, they saw that "the roof was on fire." Thereafter, "[t]he fire quickly spread to the warehouse storage area below."

36. Plaintiffs' video surveillance footage shows at least three DDP workers rushing into the Building's warehouse storage area. The footage shows the DDP workers excitedly pointing up towards the roof and looking up towards the roof and carrying a ladder to climb on top of individual storage units and within spraying distance of the roof.

37. The DDP workers knew of the fire and were immediately aware of it when it first began, as evidenced by the DDP workers rushing to the warehouse storage area while the fire was still possibly small enough to be put out using a fire extinguisher and before any smoke was visible on Plaintiffs' video surveillance footage.

38. DDP workers were unsuccessful in attempting to extinguish the fire that they started because, among other things, they were unprepared and lacked sufficient training with respect to fire prevention and safety and did not have sufficient fire extinguishers (if any) nearby and accessible when performing their roofing work.

39. DDP's lack of preparedness to extinguish the fire is illustrated by the fact that several of DDP's workers were trapped on the roof during the early stages of the fire, until they were rescued by responding firefighters.

40. The Fire Incident Report listed DDP as the only "Person/Entity Involved."

***The Aftermath of the Fire***

41. As a result of the fire, the Building—and virtually all of the personal belongings stored therein—were a total loss.

42. After the fire, a DDP worker was caught attempting to remove grinder wheels (an accessory to grinders) from the scene.

43. When the DDP worker was told that he could not remove the grinder wheels from the scene, the DDP employee attempted to conceal the grinder wheels with his jacket.

44. The State Fire Marshal who investigated the fire determined the incident of the DDP worker attempting to remove, and then conceal, the grinder wheels significant enough to take fourteen photos of the grinder wheels and jacket, which he attached to his report.

45. Moreover, multiple power tools (and accessories thereto) belonging to DDP were recovered from the Building during a site inspection that occurred on November 30, 2021, that utilize a circular blade and are known to carry a heightened risk of starting a fire when used around flammable materials. Such tools and accessories include:

   a. Two walk-behind grinders;

   b. A chop saw, which was found on top of the destroyed roof, indicating that it was located and being used on top of the roof when the fire occurred; and

   c. Circular blades, which were found on top of the destroyed roof, indicating that they were located and being used on top of the roof when the fire occurred.

46. During the same site inspection, DDP's superintendent in charge of the work at the Building stated that he was in Virginia when the fire began, rendering him unable to ensure, in person, that DDP's workers operated safely on the roof without causing an unnecessary risk of starting a fire.

47. The eye-witness DDP workers with direct knowledge of the facts and circumstances of the fire avoided investigators, and DDP never produced or otherwise provided statements or any testimony from these workers. In other words, DDP helped conceal its workers so that they could avoid providing statements that would no doubt be damaging to DDP.

48. As a result of the Fire, Plaintiffs have incurred—and continue to incur—substantial damages in having to rebuild the Building to current code, and have been deprived of years of rental income, such that current losses total significant seven figures or higher.

## COUNT 1—BREACH OF CONTRACT

49. Plaintiffs incorporate by reference all paragraphs of this Complaint as though the same were set forth herein.

50. DDP executed the Contract for DDP to provide roofing services on the Building in exchange for money.

51. Under the Contract, DDP had an obligation to achieve substantial completion of the roofing work on or before November 30, 2021.

52. The substantial completion date of the roofing work was a material term to the Contract.

53. DDP failed to achieve substantial completion of the roofing work on or by November 30, 2021. Indeed, only charred remnants of the Building remained by that November 30, 2021, date, much less a substantially completed roof.

54. Under the Contract, DDP had an obligation to be responsible for the acts and/or omissions of its workers and of its subcontractors' workers.

55. DDP's responsibility for its workers and its subcontractors' workers was a material term to the Contract.

56. In attempts to resolve this matter with DDP short of litigation, DDP breached its obligation to take responsibility for the acts and/or omissions of its workers, as it steadfastly refuses to accept liability for the fire.

57. Under the Contract, DDP had an obligation to take all reasonable safety precautions to safeguard and protect, among other things, the entire project and materials and equipment to be incorporated therein; the Building itself; and its own workers (as well as Plaintiffs' employees and contractors inside the Building).

58. DDP's obligation to take reasonable safety precautions to protect both Plaintiffs' property and the individuals inside (and on top of) the Building was a material term to the Contract.

59. DDP breached the Contract by failing to achieve substantial completion by the agreed-upon date; failing to take responsibility for the acts and/or omissions of its workers; and failing to take reasonable safety precautions to protect the Building, the worksite, and the individuals in and on top of the Building.

60. Plaintiffs have been damaged by DDP breaching its obligations under the Contract.

61. DDP is liable for breach of contract.

62. DDP is liable to pay all damages flowing from the breach of contract.

63. What is more, DDP is liable under the Contract to pay for the Plaintiffs' costs, including reasonable attorney's fees.

### COUNT 2—NEGLIGENCE

64. Plaintiffs incorporate by reference all paragraphs of this Complaint as though the same were set forth herein.

65. DDP had a duty to exercise reasonable care while working on the roof of the Building.

66. DDP breached its duty to exercise reasonable care in at least the following ways:

   a. Failing to prepare or otherwise develop a fire prevention or safety plan for the project;

   b. Failing to coordinate with the local fire department or fire marshal to ensure work being performed complied with applicable fire prevention requirements;

   c. Failure to analyze or evaluate the roofing materials in order to properly assess the risk of fire;

   d. Using combustible or gas-powered tools in or around flammable materials;

   e. Using cutting tools or other equipment such as chop saws, grinders, K-12 saws, and generators that present a high risk of creating sparks and other flammable hazards;

   f. Storing combustible materials, including gasoline, on the roof;

   g. Recklessly cutting flammable materials with tools known to throw sparks;

   h. Failure to ensure an adequate number of fire extinguishers and other fire prevention equipment was available on the roof or otherwise within a reasonable distance from the work performed;

   i. Failure to train employees in fire prevention and how to properly extinguish a fire;

   j. Failure to supervise its employees; and

   k. Such other ways as discovery may reveal

67. By its negligent acts and/or omissions, DDP not only started the fire, but it was also unprepared to extinguish the fire that it started.

68. As direct result, the Building is a total loss and Plaintiffs have suffered damages for the loss of business, the loss of business revenue, loss of goodwill, and the need to incur clean up

and environmental remediation costs and significant damages required rebuild the Building to current code.

69. DDP is liable for negligence. Moreover, DDP's conduct set forth in Paragraph 66 a through k, and throughout this Complaint, entitles Plaintiffs to punitive damages in that DDP's egregious conduct in failing to adequately plan to prevent a fire, starting the fire, failing to extinguish the fire, and then concealing evidence to hide its conduct was all done with actual malice toward Plaintiffs or in a conscious, reckless, and outrageous indifference to the health, safety and welfare of others.

## COUNT 3—RES IPSA LOCQUITOR

70. Plaintiff incorporates by reference all paragraphs of this Complaint as though the same were set forth herein.

71. The fire, which completely destroyed the Building, would not have occurred in the absence of someone's negligence;

72. The only individuals on the roof of the Building, which is where the fire started, were DDP's workers.

73. The only inference that can reasonably and legitimately be drawn from the circumstances is that DDP negligently started the fire.

74. DDP is liable under a Res Ipsa Locquitor theory of negligence.

## PRAYER FOR RELIEF

75. WHEREFORE, Plaintiffs request the following relief:

   a. All available damages relating to and arising from DDP's acts and omissions at-issue in this Complaint.

   b. All costs of suit and attorneys' fees;

    c. Punitive damages in an amount to be determined at trial for DDP's conduct that it carried out with actual malice to Plaintiffs or a conscious, reckless and outrageous indifference to the health, safety, and welfare of others;

    d. An award of pre- and post-judgment interest; and

    e. Such further relief that this Court may deem just and proper

## JURY DEMAND

Plaintiffs hereby demand a trial by jury on each and every claim set forth in this Complaint, as available under applicable law.

Respectfully submitted:

**176 RAGLAND EAT, LLC, and**
**U-HAUL CO. OF WEST VIRGINIA**

 /s/ Robert S. Pruett
R. Booth Goodwin II (W. Va. Bar No. 7165)
W. Jeffrey Vollmer (W. Va. Bar No. 10277)
Benjamin B. Ware (W. Va. Bar No. 10008)
Robert S. Pruett (W. Va. Bar No. 12683)
GOODWIN & GOODWIN LLP
300 Summers Street, Suite 1500
Charleston, West Virginia 24328
T: (304) 356-7000
F: (304) 344-9692
rbg@goodwingoodin.com
wjv@goodwingoodwin.com
bbw@goodwingoodwin.com
rsp@goodwingoodwin.com
*Counsel for 176 RAGLAND EAT, LLC and U-HAUL CO. OF WEST VIRGINIA*